**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | Criminal Nos.: 1:10-CR-139 |
| | ) | |
| **OSAMA M. EL-ATARI,** | ) | Honorable Gerald Bruce Lee |
| | ) | |
| **Defendant.** | ) | REDACTED |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

INTRODUCTION AND BACKGROUND

On August 27, 2010, Osama M. El-Atari will come before this Court for sentencing after having entered a pre-indictment guilty plea to a two-count criminal information charging him with bank fraud, in violation of 18 U.S.C. § 1344, and money laundering, in violation of 18 U.S.C. § 1957, and a guilty plea to a two-count indictment filed in the Northern District of Ohio and transferred to the Eastern District of Virginia pursuant to Rule 20 of the Federal Rules of Criminal Procedure, charging him with two counts of bank fraud in violation of 18 U.S.C. § 1344 on April 29, 2010. At the time of sentencing, Mr. El-Atari will respectfully request that this Court "vary" from the Guidelines range and impose a sentence "sufficient, but not greater than necessary" to achieve the sentencing purposes of 18 U.S.C. § 3553(a). The basis for such a variance is Mr. El-Atari's outstanding character, his contributions to the community, and his demonstrated acceptance of responsibility and remorse, as well as a Guidelines range that is not the result of the Sentencing Commission having exercised its institutional role.

In light of the Supreme Court's decision in *Gall v. United States*, it is clear that this Court has discretion in determining the appropriate sentence for Mr. El-Atari, regardless of the specific sentence called for by the Guidelines. 552 U.S. 38, 49 (2007); *see also United States v. Huff*,

No. 09-5021, 2010 U.S. App. LEXIS 15624, at *8 (4th Cir. Jul. 28, 2010) (affirming downward variance of approximately 29% because district court "amply justified that variance" based upon the totality of the circumstances surrounding the crimes and the defendant's lack of a criminal history); *United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) (en banc) (affirming district court's substantial variance to probation and home confinement because "a district court must be potentially able, when the proper situation arises, to sentence a defendant outside the Guidelines range, but within the statutory range."); *United States v. Cavera*, 550 F.3d 180, 200 (2d Cir. 2008) (en banc) (noting that the court will "set aside a district court's substantive determination only in exceptional cases where the trial court's decision 'cannot be located within the range of permissible decisions'"); *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (affirming downward variance and noting that "it will be the unusual case when we reverse a district court sentence – whether within, above, or below the applicable Guideline range – as substantively unreasonable); *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (affirming sentence of probation where Guidelines called for 41 to 51 months imprisonment and noting that the Supreme Court's recent sentencing decisions "breathe life into the authority of the district court judges to engage in individualized sentencing."). The Court clarified in the wake of *United States v. Booker*, which rendered the Guidelines "effectively advisory," that while "the Guidelines should be the starting point," the district judge "may not presume that the Guidelines range is reasonable." *Id*. at 49; *Booker*, 543 U.S. 220, 245 (2005).

Here, there is no statutory mandatory minimum sentence and no statutory prohibition against imposing a sentence of probation. Accordingly, the statutory range of available sentences is probation to thirty years in prison (the statutory maximum penalty). For the reasons set forth below, we respectfully submit that, based upon the factors set forth in 18 U.S.C. §

3553(a), a sentence significantly below the Guidelines range is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

I.      **Section 3553(a) Factors**

   A.    **Mr. El-Atari's Personal History and Characteristics**

At the age of thirty-one, Mr. El-Atari's life has been hallmarked by his devotion to his family, his community, and by his admirable work ethic, all of which have allowed him to truly achieve the American Dream.  Friends describe Mr. El-Atari as "an intelligent, responsible and respectful person in business as well as his personal life."  Letter of David R. Meade, attached as Ex. 1; *see also* Letter of Tanner Feil, attached as Ex. 2.  Mr. El-Atari's former assistant describes him as "an extremely busy, tireless executive," with inspiring ambition and a mature outlook.  Letter of Erica Ford, attached as Ex. 3.  Notwithstanding Mr. El-Atari's well-earned success, Mr. El-Atari eventually succumbed to the vice of greed, which led him to engage in the conduct which is the subject of the matters referenced above.  A thorough examination of Mr. El-Atari's background and personal characteristics, however, demonstrate that this conduct was completely uncharacteristic and anomalous behavior that will not happen again.

Mr. El-Atari was born on September 14, 1978 in Fairfax, Virginia, to Mohammed and Khetam El-Atari.  ¶ 44.  Mr. El-Atari was the third child born to the El-Atari's: his brother, Amjad is thirty-nine years old, and presently lives in Los Angeles, California; his sister, Majida, is thirty-seven years old, and lives with her two children in Dubai, United Arab Emirates.  ¶ 48.  Mr. El-Atari also has a younger brother, Belal, who was born two years after Mr. El-Atari, and with whom he worked in the restaurant business.  ¶ 48.  Mohammed and Khetam immigrated to the United States from Jordan in 1972.  Mohammed's work brought him to the United States; he was a Federal Aviation Administration ("FAA") consultant to Pan American World Airways

("Pan Am"). ¶ 44.  The El-Atari's became naturalized United States citizens in 1974, and Mohammed eventually moved from his position as an air traffic controller to a less-stressful position in ticketing.

Mr. El-Atari was raised in Sterling, Virginia, where he had a very normal and loving family life.  He visited Jordan with his family at different times throughout his childhood as well; however, the juxtaposition of being an American in Jordan and being an Arab in Sterling, Virginia, was a difficult and tragic one for him.  ██████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████  Life in Sterling was not much better: when Mr. El-Atari was twelve years-old, a group of older children tied him up and dumped black paint all over him, calling him racial names.  Notwithstanding these appalling and painful events, Mr. El-Atari focused on his family and work and, today, is a friendly, affable man who, admirably, tries to see the best in everyone and every situation.

The El-Atari's financial circumstances when Mr. El-Atari was growing up were meager; the family of six survived on Mohammed's salary as a ticketing agent for Pan Am, roughly $33,000 per year.  Mr. El-Atari's brother, Belal, explains that, despite the loving environment in which they were raised, he believes they "were brain washed into thinking that money was, and is everything."  Letter of Belal El-Atari, attached as Ex. 4.  Likewise, Mr. El-Atari's elder brother writes that "[m]oney was the most important thing in our family's life," and that he believes "the pressure to succeed was too heavy a burden for [Mr. El-Atari] to carry."  Letter of

Amjad M. El-Atari, attached as Ex. 5.  In 1993, at the age of fifteen, Mr. El-Atari found his first job at "The Deli" in Sterling, Virginia.  ¶ 46.  Belal, Mr. El-Atari's younger brother, started working there one day later.  ¶ 46.  Together, the two brothers began to assume greater and greater roles in the management of The Deli.  ¶ 46.  Mr. El-Atari describes the two of them rushing from school to get to The Deli by 3:30 p.m. every day.  The restaurant was owned by an elderly couple who were impressed by the work ethic and mentality of the two young men, and were thrilled to see the young men take over the food orders, shift management, and other work for them.  For their part, Mr. El-Atari and Belal were also thrilled to be making what was very good money for high school students.  From the time they started working, Mr. El-Atari and Belal each paid their father $250 in rent per month, which left them each with around $70 per week for themselves – a fortune to a teenaged boy.  After a couple of years, Mr. El-Atari and Belal saved enough to purchase a car for the two of them to share, a 1997 Honda Accord, about which the two brothers were beside themselves with excitement and pride.

During Mr. El-Atari's senior year in high school, the owners of The Deli approached him and Belal and suggested that the two El-Atari boys purchase the restaurant from them.  ¶ 46.  They asked the El-Ataris to put $10,000 down, and proposed to finance them the remaining $490,000.  After very serious family discussion, the El-Ataris, together, decided that this was their opportunity to achieve the American Dream: to have their own business and to work for themselves.  Mr. El-Atari and Belal sold their coveted Honda Accord, and Mohammed and Mr. El-Atari both requested cash advances on their credit cards to put together the $10,000 down-payment.  They purchased the restaurant in Mohammed's name, and changed the name to "Buffalo Wing Factory."  ¶ 47.  Within months, their investment had paid off.  In the first year the El-Ataris owned Buffalo Wing Factory, monthly sales increased by $100,000.  The family of

six, which had previously survived on less than $40,000 per year, profited $450,000 in its first year of ownership. As Mr. El-Atari says, they finally "tasted the good life."

The Buffalo Wing Factory in Sterling was only the beginning for the El-Ataris. Always business-minded and forward-thinking, Mr. El-Atari decided he wanted to open a second restaurant, which he did – and which he built himself. ¶ 47. When the Buffalo Wing Factory opened in Ashburn, it was the first American sit-down restaurant in the area, and it was wildly successful: on opening day alone, the restaurant made $20,000 in sales, and was averaging $250,000 in sales per month. ¶ 47. In 2004 and 2005, additional locations were opened in Reston and Chantilly. Notably, part of the restaurants' successes was likely the result of the work environment Mr. El-Atari created. Employees explain that they were "always appreciated and treated with the utmost respect." Letter of Eric D. Meade, attached as Ex. 6. The El-Atari family was suddenly more successful than they had ever imagined possible. As they accumulated wealth – and they did so as a family: all the restaurants were in Mohammed's name, and the family bank account was a shared one – Mohammed and Khetam sold the family home in Sterling and bought a home in Leesburg and a town-house in Ashburn. Mr. El-Atari also began to lease multiple luxury cars, among them a Ferrari, Lambroghini, Porsche, Mercedes, Bentley, and Rolls Royce. The El-Atari's were no longer "tasting" the good life, they were living it, as the fruits of their own blood, sweat, and tears.

      1.      <u>Charitable Works and Community Involvement</u>

Notwithstanding the extravagant lifestyle Mr. El-Atari was living, he spent a significant amount of his time and resources giving back to the community as well. Those who know him best describe Mr. El-Atari as "generous and kind-hearted." Letter of Scott R. Casto, attached as Ex. 7; *see also* Letter of Daniel Craig Tufts, attached as Ex. 8 ("The Osama I know is a caring

person, with a generous heart"); Letter of Cynthia R. Timmerman, attached as Ex. 9.  Mickey E. Thompson describes Mr. El-Atari as "the most generous person I know," and explains that description applied to Mr. El-Atari "long before he was involved with money laundering and fraud."  Letter of Mickey E. Thompson, attached as Ex. 10.  Much of Mr. El-Atari's energy and generosity was focused on children: starting in 2001, Mr. El-Atari began sponsoring twenty children each summer – ten from Washington, D.C. and ten from Baltimore, Maryland – to go to camp with the Send a Kid 2 Camp program.  *See* http://sendakid2camp.org.  He continued to sponsor children for the ensuing seven years.  Mr. El-Atari supplied the Sterling Youth Soccer Association with uniforms for four years and, for the past three years, Stone Bridge High School in Ashburn, Virginia with athletic gear for its teams, at a cost of approximately $25,000 each year.  Mr. El-Atari's restaurants participated in the "Jazz' Jammies" fundraisers, which collected colorful pajamas for homeless and ill children; not only did the restaurants collect donated pajamas from patrons, but they would donate $5.00 for each pair of pajamas that was donated.  Similarly, Mr. El-Atari would allow the Girls Scouts and Boy Scouts of America to conduct their fundraisers at the restaurants, and each restaurant would make a donation to the Scouts in an amount that matched their sales.

   Mr. El-Atari used his resources in other ways as well.  Following the September 11, 2001 attacks on the Pentagon, Mr. El-Atari provided and delivered dinners to approximately ten local families that had been affected by the attacks daily for two weeks.  In 2005, Mr. El-Atari and his brother, Belal, began a program through which their restaurants would donate all unused bread and all food that was within five days of its expiration date to local homeless shelters.  Since its inception, hundreds of restaurants have joined the initiative.  In 2006, Mr. El-Atari began sponsoring "Rides for the Troops;" a program at the Summit Point Raceway in Summit Point,

West Virginia. Mr. El-Atari would provide his Ferraris and his Lambroghini for wounded soldiers to drive around the race track. Mr. El-Atari also sponsored the Fairfax County Police Department Rodeo annually, and allowed all Loudoun County public responders, including police, fire and E.M.S., to eat at cost in his restaurants if they were carrying their badge.

Mr. El-Atari also assisted friends who were in need. For example, Vanessa Skinner writes that Mr. El-Atari provided her younger brother, Greg, with a "portable crib, baby swing, stroller, and baby clothes" when his first child was born and he was without the means to purchase those items himself. Letter of Vanessa Skinner, attached as Ex. 11. He similarly helped to support Chris Nichols when his twin daughters were born. *See* Letter of Chris Nichols, attached as Ex. 12. Mr. El-Atari is also known to personally drive intoxicated customers home from his restaurants. *See* Letter of Lisa R. Meade, attached as Ex. 13. Eric Basile writes that Mr. El-Atari has always been a person who "would do anything for all those close to him." Letter of Eric Basile, attached as Ex. 14.

In addition to all of this, Mr. El-Atari also made sizable donations to various charities and educational institutions, including: the American Red Cross, UNICEF, St. Jude Children's Research Hospital, the American Cancer Society, Project C.U.R.E., Save the Children, March of Dimes, Nelson Mandela Children's Fund, Camp Kesem (which runs summer camp programs for children who have or had a parent with cancer), Rainbow PUSH Coalition, the Virginia Fraternal Order of Police, PETA, Inova Loudoun Hospital Center, and Park View, Broad Run, and Loudoun Valley High Schools.

**B.    The Nature and Circumstances of the Offense**

In 2007, Mr. El-Atari's successes and growing ambition made him decide to pursue his own business opportunities; for the first time in his life, he would be operating separate from his

family.  The first step Mr. El-Atari took in the construction of his own restaurant empire was to open Lucky's Sports Theater and Grill in Springfield, Virginia.  Mr. El-Atari was able to finance the restaurant with a loan he procured from United Bank in December 2007.  ¶ 16.  Mr. El-Atari went to United Bank with legitimate intentions and listed his valid, $3 million term life insurance policy as secondary collateral for the loan.  The loan officer at United Bank explained the difference between a cash-value policy and a term life policy to Mr. El-Atari, and further advised Mr. El-Atari to procure a cash-value policy to list as secondary collateral in order to have his loan approved, after which point he could cancel the policy.  Mr. El-Atari did exactly that, and was initially under the impression from the loan officer that this was normal procedure for the bank.

Nevertheless, with the assistance of the same United Bank loan officer, Mr. El-Atari continued to apply for and receive loans; he helped Mr. El-Atari to obtain fraudulent insurance documentation and paperwork to support his loan applications from that point onward.  ¶ 11.  Instead of purchasing and cancelling life insurance policies, Mr. El-Atari and the loan officer began working together to falsify life insurance documents and to provide for the verification of those documents.  PSR ¶¶ 10-12.  Using these practices, Mr. El-Atari obtained loans from United Bank, Bank Annapolis, Virginia Heritage Bank, Wachovia Bank, Clayton Bank in Tennessee, F&M Bank in Tennessee, First Place Bank in Ohio, and Northern Trust Bank in Ohio.  ¶ 16.

Mr. El-Atari fraudulently borrowed approximately $71,100,000.  PSR ¶ 17.  Of that amount, he has paid back approximately $17,049,366.00, leaving the victim banks with losses totaling approximately $54,050,634.00.  PSR ¶ 20.  It is worth noting, however, that Mr. El-Atari used the loan money to finance legitimate business ventures in accordance with the purposes set forth in each loan application, not for his own immediate gratification.  This is not to say that Mr.

9

El-Atari did not enjoy a lavish lifestyle, but that lifestyle was funded by the profits from Mr. El-Atari's businesses, not directly by the loans. Mr. El-Atari's business ventures included: the Original Steakhouse and Sports Theaters in Ashburn, Virginia and Woodbridge, Virginia; Hotel Indigo in Nashville, Tennessee; Crofton Shopping Center in Crofton, Maryland; Cantina Cove in Brambleton, Virginia. Mr. El-Atari also invested in Q-Trax, an advertiser-supported free music download web-site based out of New York; Policy, a restaurant and lounge in Washington, D.C.; and a start-up bank in Virginia. Mr. El-Atari always intended to repay his loans, but his activities came to light before he was able to do so.

### C. Mr. El-Atari's Acceptance of Responsibility

Mr. El-Atari fully accepts responsibility for his actions and the harm he caused his victims, and expresses deep regret for what he has done. Significantly, Mr. El-Atari returned to the United States from abroad, fully knowing the weight of the criminal charges he would face. ¶ 24. Mr. El-Atari pleaded guilty, pre-indictment, to a two-count information in the Eastern District of Virginia, and to a two-count Indictment from the Northern District of Ohio on April 29, 2010. PSR ¶ 5.

Mr. El-Atari writes that he "cannot begin to tell you how remorseful I am about the crime I have committed." PSR ¶ 25. He explains that he "allowed greed, selfishness and immaturity to get a grasp of me and exploit my weaknesse's," but that he feels "guilty to my bones for failing my family, friends and myself," and that he awaits the opportunity to prove himself. PSR ¶ 25. Jessica Woolwine writes that Mr. El-Atari has admitted to her that "he was where [in jail] he felt as though he deserved to be," and that he "has shown such immense remorse to [her] for his actions." Letter of Jessica Woolwine, attached as Ex. 15. Similarly, Mr. El-Atari's sister writes that he "has demonstrated extreme remorse both privately within himself and publicly to

everyone who has come in contact with him since he has pleaded guilty." Letter of Majida Mohammad El-Atari, attached as Ex. 16.

Mr. El-Atari's words are not without the weight of action; indeed, he has repaid approximately $17,049,366.00 to the victim banks, and has forfeited all of his belongings and investments to the government, including 30,090,000 shares of stock in Q-Trax, for which Mr. El-Atari paid close to $20,000,000, and the return on his May 2008 investment in First Financial Bank, totaling approximately $300,000.00. PSR ¶¶ 17, 20, 70. Additionally, his family has assumed the almost $5,000,000 debt that Mr. El-Atari owed to Bank Annapolis. *See* Letter of Belal El-Atari, attached as Ex. 4.

Furthermore, Mr. El-Atari has cooperated and continues to cooperate with the government in five different investigations. Mr. El-Atari is hopeful that the government will file a motion to reduce his sentence based upon his cooperation pursuant to FED. R. CRIM. P. 35. Because these investigations are on-going, however, Mr. El-Atari is not in a position to ask the Court to substantively consider his cooperation at this juncture. Mr. El-Atari nonetheless submits that his cooperation is a factor this Court may now consider in evaluating his acceptance of responsibility. ████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████


### D.     Available Sentences and the Applicable Sentencing Range

This Court may, in its own discretion and based upon the factors under 18 U.S.C. § 3553(a), impose any sentence within the statutory range that it finds appropriate; in this case, that encompasses a sentence of straight probation up to thirty-years of imprisonment. *See* 18 U.S.C. § 1344.

The appropriate Guideline for a bank fraud conviction under 18 U.S.C. § 1344 is U.S.S.G. § 2B1.1, which provides for a base offense level of seven. U.S.S.G. § 2B1.1(a)(1). The parties agreed that the loss amount is between $50,000,000 and $100,000,000; accordingly, an increase of twenty-four levels is appropriate under the Guidelines. U.S.S.G. § 2B1.1(b)(M). The parties also agreed to an additional two-level increase for use of sophisticated means, an additional one-level increase because of Mr. El-Atari's money laundering conviction, and an additional two-level increase because Mr. El-Atari received more than $1,000,000 in gross receipts from financial institutions. U.S.S.G. §§ 2B1.1(b)(9)(C), 2B1.1(b)(2)(A), 2B1.1(b)(14)(A). These calculations place Mr. El-Atari's offense level at thirty-six; however,


Mr. El-Atari's offense level should be reduced by three levels based upon his acceptance of responsibility. U.S.S.G. §§ 3E1.1(a)-(b). Mr. El-Atari's resulting offense level is thirty-three, and the appropriate Guideline range 135-165 months.

Nevertheless, the advisory range should not be heeded by this Court because it is not based upon empirical data and has been severely criticized. The advisory guideline range in this case is far greater than necessary to satisfy the goals of sentencing. The harsh sentencing recommendations of § 2B1.1 are not based upon past practice or empirical data and have been increasingly rejected by sentencing courts in high-loss fraud cases.

Over the past twenty years, the Sentencing Commission has dramatically increased the severity of sentences for fraud offenders by raising the number of points imposed for the amount of loss *and* by approving a five-fold expansion in the number of specific offense characteristics. Because the Commission failed to cite empirical data when making these changes – and thus failed to fulfill its institutional role – sentencing courts have tremendous discretion to disagree, on policy grounds, with § 2B1.1's sentencing recommendations. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009) (explaining that when the Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case").

When the Sentencing Commission adopted the original guidelines in 1987, it sought to ensure that white collar offenders faced "*short* but definite period[s] of confinement." U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 56 (Nov. 2004) ("Fifteen Year Report"). The Commission thus reduced the availability of probation and

adopted a fraud guideline that subjected a defendant to no more than 78 months in prison. To justify the increase in the rate of confinement above pre-guidelines practice, the Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." USSG, ch. 1, intro., pt. 4(d) (1987).

But, the Commission has abandoned its original goal of ensuring "short but definite" sentences, and has instead steadily increased the prison sentences for fraud. The Commission has done so without the support of any empirical data demonstrating the penological value of its substantial increases in sentence severity. *See United States v. Aldelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (citing Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)) ("[B]ecause of their arithmetic approach and also in an effort to appear 'objective,' [the Guidelines] tend to place great weight on putatively measurable quantities, such as the . . . amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors.")). Moreover, loss amount is a highly imperfect measure of the seriousness of the offense. *See id.* at 509 (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[]").

In short, the Commission failed to fulfill its institutional role of considering empirical evidence when making the amount of loss central to its fraud guideline and when repeatedly increasing the amount of points imposed for specific loss amounts. The resulting fraud guideline is, therefore, entitled to no deference. Accordingly, this Court should look to all of the § 3553(a)

factors and the empirical data not considered by the Commission in fashioning a sentence "sufficient, but not greater than necessary" to fulfill the various purposes of sentencing.

Significantly, a defendant's cooperation and charitable works are among the factors courts have considered under § 3553(a), and upon which they have relied in applying downward variances. The Second Circuit Court of Appeals, for example, has recognized that a defendant's efforts to cooperate, even where "those efforts did not yield a Government motion for a downward departure," should be considered by the sentencing judge pursuant to 18 U.S.C. § 3553(a)(1). *United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006). Moreover, several recent post-*Gall* circuit court decisions are instructive when considering Mr. El-Atari's charitable works. *See*, e.g., *Tomko*, 562 F.3d 558, 563, 571-72 (affirming downward variance imposing sentence of home confinement in reliance upon defendant's "involvement in exceptional charitable work and community activity."); *United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008) (affirming downward variance imposing sentence of three months incarceration based upon defendant's relatively unexceptional good works).

A number of courts have also granted departures or variances where a fraud defendant was motivated by something other than a desire for profit or personal financial gain. *United States v. Milne*, 384 F. Supp. 2d 1309, 1310-11 (E.D. Wis. 2005) (granting variance below guidelines' recommendation where "defendant did not take the bank's money out of greed or a desire to live a lavish lifestyle, [but in effort] to keep a sinking business afloat); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) (considering mitigating evidence that defendant in bank fraud case had "not act[ed] for personal gain or for improper personal gain of another). Here, Mr. El-Atari's fraud became increasingly out-of-hand as it progressed; however, his initial motive was to legitimately grow his business. He believed that he would eventually be

able to repay the funds he had taken. The Court should take this entire picture into account in fashioning an appropriate sentence.

In light of the fact that the applicable advisory Guidelines range here is not based upon empirical data or the Sentencing Commission's exercise of its institutional role, together with Mr. El-Atari's personal history and characteristics, his charitable works and community involvement, his exceptional acceptance of responsibility, the circumstances of his offense, and his low-risk of recidivism as discussed below, a sentence within the Guidelines range would be greater than necessary to promote the goals of sentencing in this case.

### E.  Need for the Sentence Imposed to Satisfy the Purposes of Sentencing

A sentence well below the Guidelines range would fully satisfy the purposes of sentencing in this case and achieve the objectives set forth under 18 U.S.C. § 3553(a)(2). Specifically, the court is charged with ensuring that a particular sentence reflects the seriousness of the offense, promotes respect for the law, and provides just punishment, as well as deters criminal conduct, protects the public, and provides the defendant with needed training, medical care, or other treatment. *See* 18 U.S.C. § 3553(a)(2). In Mr. El-Atari's case, the ramifications of his guilty plea and the almost seven months Mr. El-Atari has already spent in jail have already served these purposes.

#### 1.  Seriousness of the Offense, Respect for the Law, Just Punishment

A felony conviction, a short sentence of incarceration, and an obligation to pay full restitution reflects the seriousness of Mr. El-Atari's offense, promotes respect for the law, and provides just punishment. Mr. El-Atari has, until this point, led a life of honesty and integrity, with a strong work ethic and an immense capacity for generosity. A felony conviction alone has ruined the reputation he has worked so hard and long to build, and which is very important to

him. Moreover, Mr. El-Atari faces a substantial restitution requirement, of which he has already paid a significant amount, and which he intends to do everything in his power to fully complete. Additionally, Mr. El-Atari has worked with the government, cooperating in situations which have placed him and his family in great danger, and his cooperation has significantly assisted the government with several investigations. All of this not only demonstrates Mr. El-Atari's recognition of the seriousness of his own offense, but shows respect for the law. Mr. El-Atari is deeply remorseful, and to sentence him to any significant period of incarceration would be greater than necessary to achieve these goals.

      2.    <u>Deterrence</u>

Mr. El-Atari is a thirty-one year-old first-time offender, who has been running his own business for thirteen years and who has truly led an upstanding and admirable life until making this mistake. He is deeply remorseful and is paying for his crime through the ruination of the reputation he has worked so hard over the past thirteen years to build, his substantial restitution obligation, and, significantly, the seven months he has already spent in jail.

Indeed, research has shown that certainty of a sentence, rather than the length of that sentence has the greatest deterrent effect. In one well-known study from the pre-guideline era, for example, researchers studied white collar offenders and found no difference in deterrence, even between sentences of probation and imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995).

In the twenty years since the Guidelines were first adopted, empirical research has continued to show that while certainty has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry,

*Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).  Instructively, the Second Circuit affirmed a significant variance in *United States v. Adelson*, from life to forty-two months, based in part on the district court's recognition that "there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."  441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006), affirmed, 301 Fed. Appx. 93 (2d Cir. 2008).  The same applies here; the seven months Mr. El-Atari has spent in jail have already served as a more than adequate deterrent.

        3.      Protection of the Public

Mr. El-Atari does not pose any harm to the public.  In fact, in light of Mr. El-Atari's contributions to the community and his willingness to help others, the public is much better off with him free.  Mr. El-Atari is deeply remorseful for his crime and will never engage in similar conduct again.  He has essentially no criminal history, nor was his crime one of violence; Mr. El-Atari poses no harm to anyone.

## CONCLUSION

For the reasons set forth in this Memorandum, we respectfully request that this Court vary from the Guidelines range and impose a sentence far below the Guidelines range which is sufficient, but not greater than necessary.

Dated:  August 20, 2010                                   Respectfully Submitted,

                                                                                                                    /s/_____
                                          Bernard S. Grimm (admitted *pro hac vice*)
                                          Cozen O'Connor
                                          1627 I Street, N.W.
                                          Suite 1100
                                          Washington, DC 20006-4007
                                          Telephone: (202) 912-4835
                                          Fascimile: (877) 260-9435

bgrimm@cozen.com

_____/s/_____
Kathryn R. Yingling (Va. Bar. No. 79242)
Cozen O'Connor
1627 I Street, N.W.
Suite 1100
Washington, DC 2006-4007
Telephone: (202) 912-4863
Fascimile: (202) 330-5648
kschellenger@cozen.com

*Counsel for Osama El-Atari*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of August, 2010, copies of the foregoing Defendant's Memorandum in Aid of Sentencing were served via ECF and by hand upon:

Jonathan Fahey
Assistant United States Attorney
Justin W. Williams United States Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314

Jack Hanley
Assistant United States Attorney
Justin W. Williams United States Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314

_____/s/_____
Kathryn R. Yingling